# United States Court of Appeals
## For the Eighth Circuit

_____

No. 17-1387

_____

Linda L. Faulkner, an individual

*Plaintiff - Appellant*

v.

Douglas County Nebraska, a political subdivision of the State of Nebraska

*Defendant - Appellee*

_____

Appeal from United States District Court
for the District of Nebraska - Omaha

_____

Submitted: May 17, 2018
Filed: October 12, 2018

_____

Before SMITH, Chief Judge, BEAM and COLLOTON, Circuit Judges.

_____

BEAM, Circuit Judge.

Linda Faulkner appeals the district court's[1] grant of summary judgment in favor of Douglas County Department of Corrections (DCDC) in this employment dispute based upon allegations of gender, age, and, most significantly, disability

_____

[1]The Honorable Laurie Smith Camp, Chief Judge, United States District Court for the District of Nebraska.

discrimination under state and federal civil rights laws. Because Faulkner cannot perform the essential functions of her job and was not discriminated against on any other basis, we affirm the district court.

## I.    BACKGROUND

At the time she filed her complaint, Faulkner was a 56-year old woman who worked for DCDC from April 2003 to January 2014, as a Correctional Officer II (COII). Based upon DCDC's job description, a COII was required to be able to control fights between inmates and to restrain combative inmates through use of necessary force at times. The physical requirements in the job description further provided that a COII must be able to stand, walk, sit, climb stairs, run, kneel, stoop, crouch, and move quickly from kneeling to standing positions; lift, grip, push, and pull certain minimal weights and forces, including the ability to lift 20 pounds frequently, lift up to 350 pounds occasionally as part of a team lift, push up to 100 pounds and pull up to 80 pounds occasionally, and push/pull up to 40 pounds on a frequent to occasional basis.

It was during a combative inmate encounter that Faulkner was injured in August 2012. She injured her shoulder and the lumbar region of her back. She was put on light duty for a short while, and then returned to full duty in late August. On September 4, 2012, Faulkner was again involved in an inmate altercation that ultimately required shoulder surgery in October 2012. She was released to return to sedentary work in late November 2012. After many more doctor evaluations and physical therapy, and having obtained "maximum medical improvement" in April 2013, Faulkner returned to light-duty work in May 2013.[2] Faulkner's functional

_____

[2]Reports were filed with the Nebraska Workers' Compensation Court after both the August and September incidents, and Faulkner received various types of workers' compensation benefits until she reached "maximum medical improvement," pursuant to the provisions of Nebraska law.

capacity evaluation (FCE) indicated that her restrictions were: lifting objects to shoulder level restricted to twenty pounds on an occasional basis and ten pounds on a frequent basis, overhead lifting restricted to fifteen pounds or less on an occasional basis, no prolonged or repetitive overhead work, and no pushing or pulling greater than forty pounds. Faulkner continued to work light duty until July 6, 2013, when she was removed from light-duty status because she used the maximum allowable number of days of light duty pursuant to the terms of the Collective Bargaining Agreement (CBA).

Shortly thereafter, in August 2013, DCDC sent her a letter notifying her that her FCE restrictions precluded her from being able to perform the essential functions of the COII job. In that letter, her supervisor suggested that Faulkner advise him if she believed some type of accommodation would allow her to perform the essential functions of the COII position, or some other position within Douglas County. On October 7, 2013, at a meeting with DCDC officials, Faulkner asked to be indefinitely reassigned to the central control or lobby, or to the Douglas County Department of Motor Vehicles (DMV) as an accommodation for her permanent injuries. Shortly thereafter, on October 11, 2013, Faulkner underwent C5-C7 disc fusion surgery.[3] On

---

[3]Faulkner's treating physician, Dr. Buzzell, found that Faulkner had degenerative disc disease which ultimately required this C5-C7 surgery in October 2013. In January 2014, Faulkner filed a claim with the Nebraska Workers' Compensation Court to further litigate the issue of whether her cervical spine issue was related to the two work injuries. Both Buzzell and another doctor who examined Faulkner in the context of the workers' compensation case found that her cervical spine injury was caused by a 2011 car accident, based upon a comparison of MRI results in 2011 after the car accident (and before the work injuries), and post-work injury MRI results. Accordingly, the Nebraska Workers' Compensation court found that Faulkner's spine injuries were unrelated to the injuries that occurred on the job, and instead originated from the 2011 car accident. She was awarded workers' compensation benefits, including vocational rehabilitation benefits, for her left shoulder injury, however.

January 31, 2014, DCDC officials terminated Faulkner's employment. DCDC indicated this was because she could not physically resume her regular COII duties with or without a reasonable accommodation, she had exhausted the amount of light duty she was entitled to under the CBA, and no positions were available at the DMV.

On August 17, 2015, Faulkner brought this action against DCDC alleging sex, disability, and age discrimination, as well as a retaliation claim all in violation of state and federal civil rights laws. The district court granted summary judgment in favor of DCDC, finding that Faulkner could not make a prima facie case of sex or age discrimination because no similarly situated males were treated differently, and no similarly situated persons under the age of 40 were treated differently; that she was not physically qualified to do her job so could not prevail on her disability and failure-to-accommodate claims; and that she abandoned her retaliation claim in briefing.[4] Faulkner appeals.

## II.   DISCUSSION

We review summary judgment de novo, taking all of the evidence and reasonable inferences in favor of the non-moving party and only affirming if there is no genuine issue of material fact. Crozier v. Wint, 736 F.3d 1134, 1136 (8th Cir. 2013).

### A.    Sex Discrimination

To establish a prima facie case of discrimination under the McDonnell Douglas framework, "a plaintiff must show (1) he is a member of a protected class, (2) he met his employer's legitimate expectations, (3) he suffered an adverse employment action,

---

[4]Faulkner does not advance retaliation arguments in her appellate briefs and we, too, consider this claim waived.

and (4) the circumstances give rise to an inference of discrimination." Pye v. Nu Aire, Inc., 641 F.3d 1011, 1019 (8th Cir. 2011). To create an inference of discrimination based upon disparate treatment, the plaintiff must show she was treated differently than similarly situated persons who are not members of the protected class. Bennett v. Nucor Corp., 656 F.3d 802, 819 (8th Cir. 2011). Once the prima facie case is established, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its action. Floyd-Gimon v. Univ. of Ark. for Med. Scis. ex rel. Bd. of Trs. of Univ. of Ark., 716 F.3d 1141, 1149 (8th Cir. 2013). If the defendant does so, the plaintiff then has the burden of proving that the defendant's proffered reason is a pretext for discrimination. Id. The state act has a similar framework, and Nebraska courts follow federal case law as persuasive authority. City of Ft. Calhoun v. Collins, 500 N.W.2d 822, 825 (Neb. 1993).

Faulkner listed seven men in her complaint who were allegedly similarly situated to her but treated more favorably by DCDC. However, the record indicates that six of them were not similarly situated to Faulkner, and one was treated the same. One of the men had no injuries, four were released back to their jobs *without* medical restrictions, and a sixth was released back to work with no medical restrictions until he retired. The seventh comparator was similarly situated to Faulkner in that he, too, could not perform the duties of a corrections officer, and was terminated. Faulkner therefore did not establish her prima facie case of sex discrimination, and the district court correctly granted summary judgment on her claim.[5]

---

[5]Faulkner argues that the district court erred in this regard because the DCDC did not assert material facts or provide argument with regard to the sex discrimination claim. However, the record belies this claim.

## B.      Failure to Accommodate/Disability

Faulkner's claims on appeal primarily focus on the DCDC's alleged failure to accommodate, engage in the interactive process, and her disability discrimination claims.  A plaintiff seeking to recover under the Americans with Disabilities Act (ADA) must establish a prima facie case of discrimination, that is Faulkner must establish: "(1) an ADA-qualifying disability; (2) qualifications to perform the essential functions of her position with or without reasonable accommodation; and (3) an adverse employment action due to her disability." Norman v. Union Pac. R.R. Co., 606 F.3d 455, 459 (8th Cir. 2010).  The burden then shifts to the employer to show a nondiscriminatory reason for the adverse action and then back to the plaintiff to show that the articulated reason is merely a pretext for discrimination.  Young v. Warner-Jenkinson Co., 152 F.3d 1018, 1021 (8th Cir. 1998) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973)). "The plaintiff retains at all times the ultimate burden of proving that the adverse employment action was motivated by intentional discrimination."  Id.  The state disability discrimination act uses a similar framework.  Father Flanagan's Boys' Home v. Goerke, 401 N.W.2d 461, 464 (Neb. 1987).

With regard to the interactive process for a request for accommodation, an employer must converse or interact with the individual about the availability of a reasonable accommodation, but "an employer need not reallocate or eliminate the essential functions of a job to accommodate a disabled employee." Fjellestad v. Pizza Hut of Am., Inc., 188 F.3d 944, 950 (8th Cir. 1999).  Indeed, the employer must make a good faith effort to assist the employee in finding an accommodation, but the employee must show she could have reasonably been accommodated if not for the employer's lack of good faith.  Faidley v. United Parcel Serv. of Am., Inc., 889 F.3d 933, 943-44 (8th Cir. 2018) (en banc).  Thus, if Faulkner cannot show there was a reasonable accommodation available, DCDC is not liable for failing to engage in the good-faith interactive process.  Scruggs v. Pulaski Cty., Ark., 817 F.3d 1087, 1094

(8th Cir. 2016); Battle v. United Parcel Serv., Inc., 438 F.3d 856, 864 (8th Cir. 2006) ("Under the ADA, if no reasonable accommodation is available, an employer is not liable for failing to engage in a good-faith interactive process."); Dropinski v. Douglas Cty., 298 F.3d 704, 709-10 (8th Cir. 2002) (holding that a discussion of the interactive process is "superfluous" where the worker cannot perform the essential job duties, and any accommodation would result in job restructuring).

It is undisputed that Faulkner had a disability and that her employment was terminated due to her disability. It is also undisputed that she could not perform the essential functions of a COII position without accommodation. The dispute centers around whether there was an available accommodation, and whether DCDC engaged in an interactive process to help her find such an accommodation. She argues that it would have been reasonable for her supervisor to accommodate her by assigning her permanently to the DCDC lobby, or to a night shift position. She argues that she worked for several years in the lobby and on the night shift without ever having any inmate contact, indicating that inmate contact was not, in actuality, an essential function of the job. Faulkner cites Benson v. Northwest Airlines, Inc., 62 F.3d 1108 (8th Cir. 1995) in support of her argument in this regard. In Benson, we held that determining whether physical qualifications are essential job functions "should be based upon more than statements in a job description and should reflect the actual functioning and circumstances of the particular enterprise involved." Id. at 1114 (quoting Hall v. U.S. Postal Serv., 857 F.2d 1073, 1079 (6th Cir. 1988)). However, the record is clear that officers assigned to lobby and night shift positions must still be able to perform the essential physical duties of a correctional officer, including the ability to restrain offenders or stop disturbances with use of force.

Faulkner also argues DCDC could have permitted her to work indefinitely in light-duty assignments without inmate contact. As stated, however, the CBA limited the number of days an employee could be assigned to light-duty work. The CBA provides that the light-duty policy was intended to benefit employees during short-

term illnesses, was not intended for long-term situations, and that a maximum of 180 days of light duty are allowed under the policy. "The ADA does not require that [DCDC] take action inconsistent with the contractual rights of other workers under a collective bargaining agreement . . . ." Benson, 62 F.3d at 1114.

Faulkner's suggested accommodations were not ones that would enable her to perform the essential functions of the COII position, but ones she perceived would relieve her of those functions. Even though she was assigned to a post where she coincidentally did not have inmate contact for a prolonged period of time during her career with the DCDC, the DCDC was not obliged to contravene a current CBA to provide Faulkner with a permanent assignment where she would be shielded from inmate contact. Because Faulkner could not perform the essential functions of her job with or without a reasonable accommodation, she was not a qualified employee. Accordingly, DCDC is not liable for failing to engage in a good-faith interactive process. Battle, 438 F.3d at 864. Faulkner's reliance upon Cravens v. Blue Cross & Blue Shield of Kansas City, 214 F.3d 1011 (8th Cir. 2000), is thus inapposite. In Cravens we held that the employer's failure to engage in the interactive process was prima facie evidence of bad faith at the summary judgment stage. Id. at 1121. However, the allegedly[6] prima facie evidence of bad faith in this case is rebutted by the incontrovertible evidence that Faulkner "could [not] have been reasonably accommodated." Id.

## C.    Age Discrimination

Faulkner also claims she was discriminated against on the basis of her age in violation of the state and federal age discrimination acts. In order to establish a prima

---

[6]We agree with the district court that there is "ample evidence in the record to support a conclusion that [DCDC] engaged in an interactive process with Faulkner," addendum at 17, but any such discussion is "superfluous" under these facts. Dropinski, 298 F.3d at 710.

facie case under the Age Discrimination in Employment Act (ADEA), a plaintiff must show: (1) she is over 40; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) substantially younger, similarly situated employees were treated more favorably.  Anderson v. Durham D & M, L.L.C., 606 F.3d 513, 523 (8th Cir. 2010); Allen v. AT & T Techs., Inc., 423 N.W.2d 424, 431 (Neb. 1988).  The district court correctly rejected this claim because Faulkner could not produce evidence of a similarly situated younger person who was treated differently.  The one comparator Faulkner did advance, a female in her 40s, was not similarly situated because that employee was ultimately released by her physicians with no restrictions, unlike Faulkner.

## III.   CONCLUSION

We affirm the district court's grant of summary judgment in favor of DCDC.

_____